IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DANA FEDOR, AND ALL OTHERS
SIMILARLY SITUATED,

        Plaintiff,

v.                              CV 17-13 MV/KBM

UNITED HEALTHCARE, INC., and
UNITED HEALTHCARE SERVICES, INC.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion for Sanctions [Doc. 104], Defendants' Opposed Motion to Enforce Settlement Agreement ("Motion to Enforce") [Doc. 105], and Plaintiff's Motion to Strike [Doc. 109]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Motion for Sanctions is well-taken and will be granted, the Motion to Enforce will be denied without prejudice to refiling, and the Motion to Strike is not well-taken and will be denied.

## BACKGROUND

Plaintiff Dana Fedor worked for Defendants as a "Care Coordinator" from in or about November 2013 until on or about November 25, 2016. Doc. 16-1 at ¶¶ 7-8. Opt-in Plaintiffs also formerly worked for Defendants as Care Coordinators. *Id.* at ¶¶ 9-32. Consistent with Defendants' policies, along with their offer letter, Defendants provided Plaintiff and Opt-in Plaintiffs with a copy of Defendants' then-current arbitration policy. *Id.* at ¶¶ 6, 9, 12, 15, 18, 21, 24, 27, 30. Plaintiff and Opt-in Plaintiffs each logged onto Defendants' PeopleSoft Human Resources Management System and electronically acknowledged receipt of, and agreement to, that arbitration policy, by clicking on the "I accept" button. *Id.* at ¶ 7, 10, 13, 16, 19, 22, 25, 28,

31. Defendants periodically revise their arbitration policy, and on January 1, 2016, while Plaintiff and Opt-in Plaintiffs were still employed with Defendants, Defendants "issued" the most recent version of their arbitration policy (the "2016 Policy"). *Id.* at ¶¶ 33, 8, 11, 14, 17, 20, 23, 26, 29, 32, 33.

On March 28, 2017, Plaintiff commenced the instant action by filing her First Amended Class and Collective Action Complaint ("Amended Complaint") to recover overtime compensation from Defendants.  Doc. 3. Plaintiff brought collective claims under the Fair Labor Standards Act ("FLSA") and class action claims under New Mexico law, on behalf of herself and Opt-in Plaintiffs, who consented to join the action (collectively, "Plaintiffs"). *Id.* at ¶¶ 34-35; Docs. 9-15. In the Amended Complaint, Plaintiff and the FLSA Class Members are defined as "Defendants' current and former 'Care Coordinators' who were paid primarily on a salaried basis and whose primary responsibilities included collecting answers to standardized medical questionnaires and imputing answers from those questionnaires into Defendants' automated system." Doc. 3 ¶ 2. Arguing that this lawsuit violates the 2016 Policy, which requires arbitration of the claims set forth in the Amended Complaint and which prohibits collective and class claims, Defendants filed a motion to compel Plaintiffs to individually arbitrate their claims. Plaintiffs opposed the motion, arguing that the 2016 Policy is not enforceable against them because there is no evidence that any of them "signed, read or even knew about this Policy." Doc. 38 at 7. Rather, Plaintiffs explained, each of them indicated acceptance only to *prior versions* of Defendants' arbitration policy (collectively, the "Earlier Policies"), each of which lacked valid consideration under New Mexico law and thus were not valid, enforceable arbitration agreements.

2

In a Memorandum Opinion and Order entered March 18, 2019 ("March 2019 Opinion"), the Court agreed with Plaintiffs that they electronically agreed to Earlier Policies and that, under New Mexico law, each of the Earlier Policies contained provisions that would render them unenforceable for lack of valid consideration. Doc. 42 at 4. The Court, however, explained that its conclusion that the Earlier Policies are unenforceable did not end the inquiry. *Id.* at 7. Specifically, the Court pointed to Defendants' representation that, on January 1, 2016, while Plaintiffs were still employed with Defendants, Defendants "issued" the 2016 Policy. *Id.* In turn, the 2016 Policy states that it is a "binding contract between UnitedHealth Group and its employee," that "[a]cceptance of employment or continuation of employment with UnitedHealth Group is deemed to be acceptance of this Policy," and that it "supersedes any and all prior versions and has been revised effective January 1, 2016." *Id.* Accordingly, the Court found that the relevant question thus remained as to whether, despite the unenforceability of the Earlier Policies, the 2016 Policy was applicable and enforceable as to Plaintiffs. *Id.*

The Court ultimately decided that it was not authorized to answer this question, because the 2016 Policy specifically delegates the threshold issue of arbitrability to the arbitrator. *Id.* Specifically, the 2016 Policy contained a "delegation provision" stating that the claims covered therein "include any disputes regarding the Policy or any portion of the Policy or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Policy or any portion of the Policy is void or voidable." *Id*. The Court found that the controversy over whether the 2016 Policy is applicable and enforceable as to Plaintiffs falls squarely within this delegation provision. *Id.* Accordingly, and applying what it interpreted as controlling, on-point authority, the Court granted Defendants' request that the Court enforce the delegation provision and, in keeping with that provision, compel Plaintiffs to arbitrate the issue

3

of the applicability and enforceability of the 2016 Policy. *Id.* at 7-9 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019), for the proposition that the Supreme Court has consistently "held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."). The Court thus compelled arbitration and entered a judgment ("Judgment") dismissing the case. Doc. 43.

Plaintiff appealed the March 2019 Opinion, arguing that this Court "impermissibly compelled arbitration before first finding that she and UHC had indeed formed the arbitration agreement underlying the district court's decision." *Fedor v. United Healthcare*, 976 F.3d 1100, 1100 (10th Cir. 2020). The Tenth Circuit agreed, concluding that "[t]he issue of whether an arbitration agreement was formed between the parties must always be decided by a court, regardless of whether the alleged agreement contained a delegation clause or whether one of the parties specifically challenged the clause." *Id.* at 1106. Applying this principle to the facts here, the Court found that, because Plaintiff claimed "that neither she nor the other class members read or accepted the 2016 arbitration agreement, [she] raised an issue of formation which . . . cannot be delegated to an arbitrator." *Id.* at 1106-07. The Tenth Circuit also rejected Defendants' "arguments to affirm on the alternate grounds that the prior arbitration agreements were valid and that the plaintiffs implicitly agreed to arbitrate any claims against UHC by commencing employment with the company," explaining that "because affirmance on these grounds would enlarge UHC's rights, UHC [could have] raise[d] them only through cross-appeal." *Id.* at 1107. The Court vacated the Judgment and remanded "for the district court to determine if Fedor and UHC formed the 2016 arbitration agreement." *Id.*

4

In accordance with the Tenth Circuit's directive, this Court considered on remand "whether, despite the unenforceability of the prior versions of Defendants' arbitration policies to which Plaintiff and Opt-in Plaintiffs agreed, Plaintiff and/or the Opt-in Plaintiffs 'formed' the 2016 Arbitration Policy such that the 2016 Arbitration Policy is applicable and enforceable as to Plaintiff and Opt-in Plaintiffs." Doc. 50. In a Memorandum Opinion and Order entered on May 5, 2021 ("May 2021 Opinion"), the Court found that, except for Cindy Hays, an Opt-in Plaintiff who undisputedly signed the 2016 Policy, neither Plaintiff nor the remainder of the Opt-in Plaintiffs could be compelled to arbitrate their claims against Defendants. Doc. 72. In reaching this decision, the Court found that, while Hays had been rehired by Defendants and, in connection with her rehire, agreed to the 2016 Policy on June 26, 2017, the 2016 Policy was *not* formed as to Plaintiff and the remainder of the Opt-in Plaintiffs. The Court further found that the earlier policies that Plaintiff and the Opt-in Plaintiffs signed were unenforceable for lack of consideration and that the offer letters sent to Plaintiffs and the Opt-in Plaintiffs prior to their employment did not constitute separate, enforceable agreements to arbitrate. *Id.*

Defendants appealed the May 2021 Opinion to the extent that it denied their motion to compel arbitration, but not on any of the grounds decided by this Court. Doc. 80-1. Instead, they argued that this Court had overlooked a second theory of formation, namely that a January 1, 2016 "intranet" posting was an offer to enter into an agreement to arbitrate, and that Plaintiffs accepted the offer when they continued working for Defendants. *Id.* The Tenth Circuit found that, because they had not raised this second theory of formation in the district court, Defendants had forfeited their right to raise it on appeal. *Id.* On this basis, the Tenth Circuit affirmed the May 2021 Opinion. *Id.*

Plaintiffs filed a Motion for One-Step Notice Pursuant to the Fair Labor Standards Act [Doc. 62] and a Motion for Equitable Tolling [Doc. 63]. In the One-Step Notice, Plaintiffs explained that Defendants "employed Plaintiffs and other salaried employees in New Mexico to perform care coordination functions under various job titles that contain one or more of the following terms: (1) Case Manager; (2) Care Coordinator; and/or (3) Service Coordinator (collectively, 'Care Coordination Employees' or 'CCEs')," and that, regardless of which job title was used, these individuals "performed the same job duties," and were referred to by Defendants as "Care Coordinators." Doc. 62 at 405.

Before the Court ruled on Plaintiffs' motions, the parties filed an Agreed Motion to Stay Proceedings Pending Settlement Discussions ("Motion to Stay") [Doc. 85]. In their motion, the parties stated that they wished "to temporarily pause these proceedings so that they m[ight] engage in settlement discussion," and requested an order staying the case "pending mediation." *Id.* In the motion, the parties represented that Defendants "will provide payroll data for members of the proposed settlement class within 45 days of the Order staying the case," and that Plaintiffs will prepare and send proposed damages calculations to Defendants within 75 days of the Order." *Id.* At that point, the only definition of "settlement class" was that found in the Amended Complaint, which, as noted above, consisted of "Defendants' current and former 'Care Coordinators,'" a term which, as Plaintiffs explained in their One-Step Notice, included salaried employees who performed care coordination functions under various job titles. Doc. 3 ¶ 2, Doc. 62 at 4-5. In its Order Granting Agreed Motion to Stay Proceedings Pending Settlement Discussions ("Order Granting Motion to Stay") [Doc. 86], the Court granted the agreed motion. The Order Granting Motion to Stay states that "Defendants will provide payroll data for members of the proposed settlement class." *Id.*

6

According to Plaintiffs, during the ensuing settlement negotiations, the only limitation on the settlement class to which the parties agreed was "to limit the class by excluding a single job title – the 'Case Manager RN' position." Doc. 110 at 2. To substantiate their position, Plaintiffs submit email messages between the parties' counsel. On May 18, 2022, Plaintiffs' counsel wrote, "we think excluding the RN Case Manger position from the settlement class makes sense." Doc. 110-1. On May 22, 2022, defense counsel responded, "we are open to th[at] proposal." *Id.* On June 3, 2022, Plaintiffs' counsel wrote again, asking defense counsel to confirm "how many individuals are in the class (and how many are in the Case Manager RN position being carved out)." *Id.*

On July 22, 2022, Defendants provided payroll data to Plaintiffs. Doc. 104 at 2. The data was for 239 individuals, whom Defendants describe as "former Care Coordinators." Doc. 105 at 2-3. Defendants explain that they did not include data for any "Care Coordinators who had executed the 2016 Arbitration Agreement," which this Court, in the May 2021 Opinion, held to be enforceable, as those individuals "were prohibited from pursuing claims on a collective or class basis." *Id.* According to Plaintiffs, however, "there was never any agreement to exclude individuals based on their date of hire or execution of an arbitration agreement," and Defendants never advised Plaintiffs that they excluded from the payroll data individuals hired after 2016." Doc. 113 at 3. Defendants have submitted no evidence demonstrating that they informed Plaintiffs of their exclusion from the payroll data individuals who signed the 2016 Arbitration Agreement.

Plaintiffs used the payroll data provided by Defendants to create a damage model. Doc. 105 at 3. That damage model was then relied on throughout settlement negotiations. *Id.* After participating in mediation, the parties ultimately reached an agreement, which they memorialized

in a settlement agreement executed on August 11, 2023 (the "Settlement Agreement"). Doc. 106-1. The Settlement Agreement also relied on the payroll data provided by Defendants, defining "Putative Class Members" as "Named Plaintiff and [the] 239 individuals whom Defendant identified and [for whom Defendant] provided pay data to Named Plaintiff." *Id.* ¶ 1.5. The Settlement Agreement further defines a "Final Settlement Class Member" as "Named Plaintiff, the Opt-In Plaintiffs, and any Putative Class Member who timely submits a properly completed Claim Form prior to the Bar Date in accordance with the requirements of this Settlement Agreement." *Id.* ¶ 1.16. The Agreement binds "[e]ach member of the Final Settlement Class [to] this agreement," and provides that each Final Settlement Class Member shall "fully release Defendant[s]" from any claims. *Id.* ¶¶ 6.2, 4.2. As to "[i]ndividuals that do not submit a claim form," the Settlement Agreement makes clear that they are not "Final Settlement Class Members" and thus "will not release any claims against [Defendants]." *Id.* ¶ 4.1.

In the Settlement Agreement, the parties agreed that they had "been represented by counsel throughout all negotiations which preceded the execution of this Agreement," and that the Agreement was "made with the consent and advice of counsel." *Id.* ¶ 6.1. Further Plaintiffs' counsel "represent[ed] that the terms and conditions of this settlement are fair, reasonable, adequate, beneficial to and in the best interest of Named Plaintiff and the Class Members." *Id.* The parties also "acknowledge that they have been represented by competent, experienced counsel throughout all negotiations, which preceded the execution of this Agreement," and that the Agreement was "made with the consent and advice of counsel who have jointly prepared this Agreement." *Id.* Further, the parties agreed that the Settlement Agreement and its attachments "constitute the entire agreement between the Parties concerning the subject matter hereof. No extrinsic oral or written terms shall modify, vary, or contradict the terms of this Agreement." *Id.*

¶ 7.2. Finally, the Settlement Agreement provided that the parties would file a "Stipulation of Dismissal," the form of which was attached to the Settlement Agreement as Exhibit D, within seven calendar days of the Bar Date. Doc. 106-1 ¶ 1.21.

The following steps were taken in accordance with the terms of the Settlement Agreement. A Settlement Administrator was appointed, defense counsel provided the Settlement Administrator with the list of the Putative Class Members, and Plaintiffs' counsel provided the Settlement Administrator with the agreed-upon distribution amounts for each Putative Class Member. Thereafter, Defendant transferred funds into a Qualified Settlement Fund and the Settlement Administrator mailed a Class Notice and a Claim Form to each of the Putative Class Members. Any Putative Class Member who submitted a Claim Form on or before the "Bar Date", which was November 28, 2023, became a "Final Class Member," and was sent a settlement check within 14 days after the Bar Date. Further, within seven days after Defendants funded the Qualified Settlement Fund, the Settlement Administrator paid Plaintiffs' counsel their attorney's fees and expenses. To date, however, Plaintiffs have not agreed to file a Stipulation of Dismissal.

Plaintiffs, through the Declaration of their counsel, explain their refusal to close this case as follows. After settlement notices were mailed out, both the Settlement Administrator and Plaintiffs' counsel "began receiving calls from individuals who believed they should have been included in the settlement but did not receive a notice." Doc. 104-1 ¶ 12. After being notified of these calls on October 4, 2023, on October 16, 2023, defense counsel responded, stating that the individuals who called: "(1) were hired after January 1, 2016, and therefore executed an enforceable arbitration agreement; (2) were employed as registered nurses ("RNs") or licensed practical nurses ("LPNs"); or (3) were not in Defendants' records as current or former

employees." *Id.* ¶¶ 13-14. Plaintiffs' counsel insisted that: the parties had agreed to exclude from the settlement class only those individuals "who worked specifically in the Case Manager RN position"; "there had been no additional exceptions based on hire date, participation in an arbitration agreement, or nursing licensure"; and defense counsel's explanation was "inconsistent with the class list, which included numerous individuals that were hired after January 1, 2016." *Id.* ¶¶ 15, 16.  The parties' counsel had numerous calls and email exchanges, wherein Plaintiffs' counsel repeatedly insisted that they needed "a complete class list" so that they could settle the individuals "incorrectly excluded" from the settlement class "on the same basis as the rest of the class," and defense counsel repeatedly said they were conferring with their client or "awaiting a response" from the client, and would respond shortly. *Id.* ¶¶ 17-29. At one point, defense counsel "acknowledged that he had no recollection (or evidence) of any agreement to exclude individuals other than Case Manager RNs." *Id.* ¶ 22.

On December 5, 2023, United States Magistrate Judge Steven C. Yarbrough held a conference to discuss the status of closing documents. Doc. 97. Plaintiffs' attorney indicated that while there was "a dispute over some class members that Plaintiffs believe should have been on the class list, but were not included," the parties nonetheless had "agreed that the amount allocated for settlement will stay the same." *Id.* He stated that the parties would "need to come up with a mutually agreeable way to settle out these other people," and "would likely file something with the Court to resolve that issue." *Id.* Plaintiffs' attorney indicated that he could "probably file closing documents by January/February." *Id.* Judge Yarbrough ordered closing documents by January 31, 2024, and indicated that if the parties could not meet that deadline, they could request a conference. *Id.*

On January 23, 2024, Plaintiffs filed an Opposed Motion to Extend Deadline to File Closing Documents. Doc. 99. In their motion, Plaintiffs asserted that, to date, Defendants' counsel had not resolved the deficiencies of the class list. *Id.* As a result of their belief that Defendants "never had any intention of providing a substantive response regarding the significant issues with the class list and were simply trying to run out the clock until the deadline to file closing documents passed," Plaintiffs noted their intention "to file, among other documents, a motion for sanctions, a motion to toll the statute of limitations for all affected individuals, and a motion to compel a complete class list." *Id.* To that end, Plaintiffs requested "that the Court set a new deadline of February 28, 2024 for either (1) the Parties to file closing documents or (2) Plaintiffs to file any requests for additional relief." *Id.* In their Response to Plaintiffs' Opposed Motion to Extend Deadline to File Closing Documents, Defendants denied that they "failed to disclose all members of the putative class," and insisted that there were "no additional putative plaintiffs to be identified and included in this settlement." Doc. 102. Accordingly, Defendants asked the Court to deny Plaintiffs' Motion for any longer than seven days. *Id.*

In its Order Granting Motion for Extension, the Court indicated that it had "insufficient information to decide whether the class-list issue ha[d] merit," and accordingly, allowed the parties to brief the issue. Doc. 103. The Court granted "Plaintiffs' request for extension to allow the parties time to further confer and file any motions either side deems necessary." *Id.* The Court therefore ordered that "[t]he deadline is extended to February 28, 2024 for the parties to either file closing documents or file other motions related to the settlement." *Id.*

Thereafter, on February 28, 2024, Plaintiffs filed their Motion for Sanctions, asking the Court to impose sanctions on Defendants, pursuant to both its "inherent powers" and Rule 37(b)

of the Federal Rules of Civil Procedure, "for Defendants' failure to provide complete pay data in connection with the settlement of this case." Doc. 104. Defendants, in turn, filed their Motion to Enforce on March 7, 2024, arguing that, given "Plaintiffs' groundless refusal to dismiss this matter" in accordance with the terms of the Settlement Agreement, the Court should enforce the Settlement Agreement and dismiss this matter with prejudice. Doc. 105. Plaintiffs then filed their Motion to Strike, arguing that Defendants' Motion to Enforce is untimely, as it was filed after the Court-imposed deadline of February 28, 2024. Doc. 109. Plaintiffs' Motion for Sanctions and Motion to Strike, and Defendants' Motion to Enforce, are now before the Court.

## DISCUSSION

As described above, the parties herein entered into a Settlement Agreement, which identified Putative Class Members, set up a mechanism for Defendants to fund a settlement fund from which those Putative Class Members who submitted claims would be paid, and fixed a time for the filing of a joint stipulation of dismissal of this action for seven days following the deadline for Putative Class Members to submit a claim form. At this juncture, Defendants have funded the settlement fund, and more than seven days have passed since the deadline for Putative Class Members to submit their claims. Plaintiffs, however, are not willing to file a stipulation of dismissal of this action, because of Defendants' exclusion of individuals from the list of Putative Class Members – the list on which the negotiations and final version of the Settlement Agreement were based. Plaintiffs request that the Court sanction Defendants on this basis. Defendants disagree, and separately ask the Court to enforce the Settlement Agreement by dismissing this action. Plaintiffs do not agree to this request, arguing that it should be stricken as untimely or, in the alternative, denied on the merits. For the reasons set forth herein, the Court finds that Defendants' failure to identify class members, disclose information about class

members, and respond to Plaintiffs' concerns about those failures are sanctionable and that, based on these same failures, the Court should refrain from enforcing the Settlement Agreement, which would result in closure of this case.

I.    Plaintiffs' Motion for Sanctions

Because of Defendants' "failure to provide complete pay data in connection with the settlement of this case," Plaintiffs ask the Court to impose sanctions on Defendants pursuant to either Rule 37(b) of the Federal Rules of Civil Procedure or the Court's "inherent powers." Doc. 104 at 1. In support of this request, Plaintiffs assert that, although the only limitation placed on the proposed settlement class was that it would not include Case Manager RNs, Defendants improperly excluded other individuals from the group for whom it provided pay data, which group ultimately became the Putative Class Members in the Settlement Agreement. *Id.* at 2-3. Plaintiffs further assert that, after the settlement notices were mailed out and they began to realize the improper exclusions, their counsel contacted defense counsel to address the issues, but defense counsel was dilatory at best in responding. *Id.* Ultimately, when defense counsel finally "provided a spreadsheet explaining why each of the identified individuals had been excluded from the class list," Plaintiffs discovered that while "many of the individuals were properly excluded because they were Case Manager RNs, a significant number of them were excluded for improper reasons, including being hired after January 1, 2016." *Id.* at 3. Although defense counsel at first appeared willing to work with Plaintiffs' counsel to resolve their dispute as to the proper scope of the class, defense counsel ultimately "refused to provide any response regarding the class list." *Id.* at 5.

Rule 37 provides in relevant part that the Court may sanction a party who fails to comply with a court order. Fed. R. Civ. P. 37(b)(2)(C). Further, where a party's conduct is "unreachable

by statute or rule," courts nonetheless have "inherent authority to sanction a party for bad-faith conduct." *Farmer v. Banco Popular of N.A.*, 791 F.3d 1246, 1256-57 (10th Cir. 2015). "A district court's inherent power to sanction . . . authorizes sanctions for wide-ranging conduct constituting an abuse of process." *Id.* at 1257. "Bad faith occurring during the course of litigation that is abusive of the judicial process *undisputably*, at the discretion of the court, warrants sanction[s]." *Id.* at 1256 (emphasis in original; citation omitted). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991).

According to Plaintiffs, "by not producing complete class data," Defendants violated the Court's Order Granting Motion to Stay, and by neither producing complete class data nor curing that "defect once it was identified," Defendants engaged in bad faith. Doc. 104 at 6-7. As discussed above, the parties represented in their Motion to Stay that Defendants would "provide payroll data for members of the proposed settlement class." *See* Doc. 85. Although that Motion did not define "settlement class," that term had been defined in the Amended Complaint as "Defendants' current and former 'Care Coordinators,'" and had been further defined in Plaintiffs' One-Step Notice to include all salaried employees who performed care coordination functions under various job titles. Doc. 3 ¶ 2, Doc. 62 at 4-5. At no point did Defendants provided an alternative definition for the settlement class. Moreover, Plaintiffs' evidence, which Defendants have provided no evidence to refute, demonstrates that the only limitation on the settlement class to which the parties agreed was "to limit the class by excluding a single job title – the 'Case Manager RN' position." Doc. 110 at 2; *see also* Doc. 104-1 ¶ 22 (stating that defense counsel "acknowledged that he had no recollection" of an agreement between the parties to exclude anyone other than Case Manager RNs). Nonetheless, Defendants unilaterally decided to

14

exclude from the payroll data individuals hired after 2016 – and made this decision without ever informing Plaintiffs. Regardless of Defendants' reasoning, namely, that individuals hired after January 1, 2016 were bound by the 2016 Arbitration Agreement, Defendants' failure to provide payroll data for *all* members of the proposed settlement class, and their failure to inform Plaintiffs of the exclusion they applied, violated the Order Granting Motion to Stay and constituted bad faith.

Further, Defendants' dilatory and dismissive tactics once Plaintiffs brought to their attention the calls that they been receiving from individuals who worked as care coordinators but did not receive a notice of settlement also constitute bad faith. Specifically, although repeatedly advising Plaintiffs' counsel that they would discuss the issue with their clients and get back to them, defense counsel never responded to Plaintiffs' counsel. *See* Doc. 104-1. Nor did defense counsel make any statements to the contrary when Plaintiffs' counsel advised the Court during the December 5, 2023 conference that the parties were working to come up with a "mutually agreeable way to settle out" the people excluded from the class list. Doc. 97. Defendants never approached Plaintiffs to work out an additional settlement or, alternatively, to advise that they had no intention of doing so, instead choosing to wait for the deadline to file closing documents to pass, and then, in the wake of Plaintiffs' request for sanctions, asking the Court to enforce the Settlement Agreement.

In sum, the Court finds that sanctions are warranted against Defendants under Rule 37 or, alternatively, under its inherent powers. Specifically, the Court will order Defendants to produce complete pay data (including names and contact information) for Defendants' current and former Care Coordinators, including all salaried employees who performed care coordination functions under various job titles, regardless of hire date and regardless of whether that employee signed

the 2016 Arbitration Agreement, and excluding only those individuals who held the job title of Case Manager RN. The Court also will order Defendants to pay Plaintiffs' reasonable attorney's fees and expenses incurred in trying to obtain a complete class list from Defendants, for the period beginning on October 4, 2023, when Plaintiffs' counsel first notified defense counsel of their concerns, and ending on February 28, 2024, when Plaintiffs filed their Motion for Sanctions. The Court directs Plaintiffs to file a motion for attorney's fees and expenses, including supporting affidavits and documentation, within ten days of entry of this Memorandum Opinion and Order.

II.    <u>Defendants' Motion to Enforce</u>

*Timeliness*

As Plaintiffs admit, there is no legal mechanism for the Court to strike a motion. Rule 12(f) of the Federal Rules of Civil Procedure allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." But by its terms, Rule 12(f) "applies only to material contained in a 'pleading,'" and generally, "motions, briefs, and memoranda may not be attacked by a motion to strike." *Ysais v. New Mexico Jud. Standard Comm'n*, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009) (citing *Searcy v. Soc. Sec. Admin.,* 956 F.2d 278, 1992 WL 43490, *1, *4 (10th Cir. March 2, 1992) (affirming denial of a motion to strike defendant's motion to dismiss because "there is no provision in the Federal Rules of Civil Procedure for motions to strike motions and memoranda")).

Plaintiffs argue that the Court is nonetheless authorized to strike "untimely motions and oppositions" under its "inherent authority to manage its docket." Doc. 109 at 2. But the Court disagrees with the premise of this argument, namely that, by filing their Motion to Enforce after February 28, 2024, Defendants violated the Court's Order Granting Motion for Extension.

During the December 5, 2023 conference, despite identifying a "dispute" over whether certain class members had been excluded from the "class list," Plaintiffs' attorney represented that closing documents could probably be filed by January or February. Doc. 97. The Court then set a deadline for the filing of closing documents for January 31, 2024. *Id.* As that deadline was approaching, Plaintiffs filed their motion to extend, which was opposed by Defendants. Doc. 99. Plaintiffs indicated that, because of unresolved "deficiencies of the class list," Plaintiffs were not prepared to file closing documents. Plaintiffs specifically requested until February 28, 2024 "for either (1) the Parties to file closing documents or (2) *Plaintiffs* to file any requests for additional relief." *Id.* (emphasis added). The Court's understanding at the time it entered its Order Granting Extension was thus that *Plaintiffs*, by February 28, 2024, would either resolve their dispute with Defendants and jointly file a stipulation of dismissal, or file "requests for additional relief," including a motion for sanctions, a motion to toll the statute of limitations, and a motion to compel a complete class list. It was based on this request, then, that the Court set a new deadline of February 28, 2024 "for the parties to either file closing documents or file other motions related to the settlement." Doc. 103.

Read in context, it is clear that the Court deadline was intended to apply only to (1) the joint filing of a stipulation of dismissal or, if Plaintiffs would not agree to such a filing, (2) Plaintiffs' filing of motions to address the concerns they had already identified about Defendants' nondisclosure of class members. Indeed, Defendants could not logically have filed a motion to enforce the settlement until after Plaintiffs ultimately chose the latter course. To hold Defendants to the February 28, 2024 deadline for filing a motion that could only have been filed as a reaction to Plaintiffs' refusal to file closing documents by that very same date would be

17

nonsensical. The Court thus will not strike as untimely Defendants' Motion to Enforce, but rather will consider that Motion on its merits.

*Merits*

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993). "Issues involving the enforceability of a settlement agreement are resolved by applying state contract law." *Starr v. Roche*, 33 F. App'x 432, 433 (10th Cir. 2002). In New Mexico, "[i]t is well settled law that [the] Court generally enforces settlement agreements." *Montano v. New Mexico Real Estate Appraiser's Board*, 200 P.3d 544, 547 (N.M. Ct. App. 2008); *see also Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 749 P.2d 90, 92 (1988) (discussing policy of enforcing settlement agreements). "Courts look favorably when parties resolve their disputes and, as a result, hold such agreements in high regard and require a compelling basis to set them aside." *Builders Contract Interiors, Inc. v. Hi-Lo Indus., Inc.*, 134 P.3d 795, 798 (N.M. Ct. App. 2006). Accordingly, "[a]n agreement of settlement will not be set aside just because it later proves to have been unwise or unfortunate for one party to enter into the agreement." *Montano*, 200 P.3d at 547. Indeed, the New Mexico courts "have consistently held that in negotiating a settlement contract, the parties are bound by its provisions and must accept both the burdens and benefits of the contract." *Id.* This is in keeping with the "strong public policy of freedom to contract" in New Mexico, where "courts have consistently enforced clear contractual obligations." *Builders*, 134 P.3d at 798.

"Failing a showing of ambiguity in a contract, or evidence of fraud, where the parties are otherwise competent and free to make a choice as to the provisions of their contract, it is fundamental that the terms of contract made by the parties must govern their rights and duties."

*Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 650 P.2d 825, 828 (N.M. 1982). For this reason, the Court "do[es] not use equitable principles 'to save a party from the circumstances it created.'" *Builders*, 134 P.3d at 798. Rather, the Court "will allow equity to interfere with enforcing clear contractual obligations only when well-defined equitable exceptions, such as unconscionability, mistake, fraud or illegality, justify deviation from the parties' contract." *Montano*, 200 P.3d at 548; *see also Smith*, 650 P.3d at 822 (where an agreement "was negotiated at arm's length, [] absent an affirmative showing of mistake, fraud or illegality, . . . the fact that some terms of the agreement resulted in a hard bargain or subjected a party to exposure of substantial risk does not render a contract unconscionable").

Nonetheless, the "[m]isrepresentation of a material fact" may entitle a party to equitable relief from enforcement of a contract if that party "justifiably relied" on the misrepresentation. *Ledbetter v. Webb*, 711 P.3d 874, 877 (N.M. 1985). The equitable relief available when a party has justifiably relied on a misrepresentation of material fact is rescission, "which seeks to restore the status quo ante." *Ledbetter*, 711 P.2d at 877. A party who seeks rescission "must return or offer to return that which has been received under the contract as a condition precedent to maintaining a suit for rescission." *Id.* at 878.

Invoking New Mexico's strong policy favoring enforcement of settlement agreements, Defendants urge the Court to enforce the Settlement Agreement. In support of their request, Defendants point out that the unambiguous terms of the Settlement Agreement, which was reached after more than a year of arms-length negotiations, make clear that it applies only to "Named Plaintiff and [the] 239 individuals whom Defendant identified and [for whom Defendant] provided pay data to Named Plaintiff." Doc. 105 at 7; Doc. 106-1 ¶ 1.5. Thus, according to Defendants, "the Settlement Agreement specifically identifies each member of the

Putative Class and states unequivocally that Defendants are settling [with] those individuals only." Doc. 105 at 7. Defendants further note that the conditions precedent to the parties' joint filing of a stipulation of settlement have been satisfied, as Defendants have funded the Qualified Settlement Fund and, from that Fund, the Settlement Administrator has distributed payments to the Final Settlement Class Members and Plaintiffs' attorneys. *Id.* Under these circumstances, Defendants contend, "Plaintiffs' remorse" is an insufficient reason to prevent enforcement of the Settlement Agreement. *Id.* Defendants ask the Court to enter an order of dismissal, thereby effectuating the final terms of the Settlement Agreement.

There is no indication that Plaintiffs were "rushed into signing the agreement," or "deprived of an opportunity to fully examine the terms of the contract prior to its execution." *Smith*, 650 P.2d at 828. To the contrary, in the Settlement Agreement, Plaintiffs expressly acknowledged that they had "been represented by competent, experienced counsel throughout all negotiations, which preceded the execution of this Agreement," and that the Agreement was "made with the consent and advice of counsel who have jointly prepared this Agreement." Doc. 1-6-1 ¶ 1.6. Also in the Settlement Agreement, Plaintiffs' counsel represented that "the terms and conditions of th[e] settlement are fair, reasonable, adequate, beneficial to and in the best interest of Named Plaintiff and the Class Members." *Id.*

Although they do not deny the accuracy of these representations, Plaintiffs oppose Defendants' Motion to Enforce. Plaintiffs' opposition rests on much the same grounds as does their request for sanctions, namely, that Defendants improperly excluded individuals from the settlement class, thereby "misrepresenting the scope of the class data they provided." Doc. 110 at 4. According to Plaintiffs, they relied on this misrepresentation "to calculate damages for settlement purposes." *Id.*

20

While Plaintiffs ask the Court to refrain from enforcing the Settlement Agreement based on Defendants' alleged misrepresentation regarding the scope of the class data they provided, notably absent from their response is any request for specific relief, or an alternative to enforcement of the Settlement Agreement. The Court thus is left in the novel position of divining what, if any, remedy is appropriate, given its earlier determination that Defendants acted improperly in withholding pay data for certain individuals from the universe of data on which the terms of the Settlement Agreement were negotiated.

Although Plaintiffs do not explicitly request that the terms of the Settlement Agreement themselves be modified or altered to add individuals who were not included in the defined term "Putative Class Members," the Court notes that such a request would necessarily be denied, as it would run afoul of New Mexico's parole evidence rule. *Memorial Med. Ctr, Inc. v. Tatsch Constr., Inc.*, 12 P.3d 431, 437 (N.M. 2000) ("Evidence contradicting a term, especially a term which explicitly states it is to be defined by the contract itself, is still prohibited under New Mexico's parole evidence rule."). Evidence of Defendants' earlier representations that only Case Manager RNs would be excluded from the settlement class "*for the purpose* of varying the terms of the agreement as memorialized," *i.e.,* to change the membership of the settlement class to something other than "Putative Class Members" as defined in the Settlement Agreement, would be improper. *Wilburn v. Stewart*, 794 P.2d 1197, 1199 (N.M. 1990) (emphasis in original). Accordingly, to the extent that Plaintiffs request, by opposing enforcement of the Settlement Agreement, to have this Court substitute a new definition of "Putative Class Members" for that set forth in the executed Settlement Agreement, the Court would decline that request.

As noted above, however, where a party has entered into an agreement in reliance on a misrepresentation, it may request the equitable remedy of rescission to "restore the status quo

ante," *i.e.*, undo an agreement entirely. *Ledbetter*, 711 P.3d at 877. This remedy, however, is available only if the aggrieved party has demonstrated that it "justifiably relied" on the misrepresentation, and that it has met the "condition precedent" of "return[ing] or offer[ing] to return that which has been received under the contract." *Id*. Assuming *arguendo* that Plaintiffs' reliance on Defendants' misrepresentation was justified, Plaintiffs are not entitled to rescission of the Settlement Agreement, as they have not "attempt[ed] or offer[ed] to return" any of the funds that Defendants paid into the Qualified Settlement Fund. *Wilburn*, 794 P.2d at 1200-01. Indeed, those funds have now been distributed to the Final Settlement Class Members and Plaintiffs' counsel. Accordingly, as it currently stands, the Court could not grant any theoretical request for rescission by Plaintiffs.

Nor does it appear from Plaintiffs' statements to the Court that rescission is what they seek. Specifically, during the conference to discuss the status of closing documents, although reporting "a dispute over some class members that Plaintiffs believe should have been on the class list, but were not included," Plaintiffs' counsel advised the Court that the parties nonetheless had "agreed that the amount allocated for settlement will stay the same." Doc. 97. Accordingly, Plaintiffs' counsel explained that the issue yet to be resolved was how to "come up with a mutually agreeable way to settle out these other people." *Id.* And, in their Motion for Sanctions, Plaintiffs propose that "Defendants provide a complete class list and identify all individuals that were incorrectly excluded from the list *and settle those individuals' claims on the same basis as the rest of the class.*" Doc. 104 at 4 (emphasis added). Indeed, a potential settlement between Defendants and the individuals who were excluded from the class list is not dependent on rescission of the Settlement Agreement, which, by its own terms, binds only the members of the Final Settlement Class, and explicitly states that individuals who are not Final

Settlement Class Members do not release any claims against Defendants. Doc. 106-1 ¶¶ 6.2, 4.2, 4.1. Individuals excluded from the class list thus are not bound by the terms of the Settlement Agreement; it follows that they may pursue claims against Defendants even if the Settlement Agreement is not rescinded.

Given the Court's decision to compel Defendants to provide Plaintiffs with the missing data, the Court will refrain, for now, from reaching the issue of whether the Settlement Agreement should be enforced. The Court thus will deny, without prejudice to refiling, Defendants' Motion to Enforce. Plaintiffs will have 90 days from the date on which they receive the requested documentation from Defendants to file a motion for equitable relief from the Settlement Agreement, if they choose to do so. Plaintiffs are reminded that, to rescind the Settlement Agreement, they must first return the funds paid by Defendants into the Qualified Settlement Fund. If Plaintiffs do not timely file a motion for equitable relief by the Court-imposed deadline, Defendants may file a motion to enforce the Settlement Agreement, seeking dismissal of this case.

**CONCLUSION**

For the foregoing reasons, the Court will compel Defendants to produce complete pay data (including names and contact information) for Defendants' current and former Care Coordinators, including all salaried employees who performed care coordination functions under various job titles, regardless of hire date and regardless of whether that employee signed the 2016 Arbitration Agreement, and excluding only those individuals who held the job title of Case Manager RN. The Court also will order Defendants to pay Plaintiffs' reasonable attorney's fees and expenses incurred in trying to obtain a complete class list from Defendants, for the period beginning on October 4, 2023, when Plaintiffs' counsel first notified defense counsel of their

concerns, and ending on February 28, 2024, when Plaintiffs filed their Motion for Sanctions. The Court will refrain from deciding Defendants' Motion to Enforce until the required documentation is produced and Plaintiffs have decided whether to request rescission of the Settlement Agreement.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Sanctions [Doc. 104] is **GRANTED**, Plaintiff's Motion to Strike [Doc. 109] is **DENIED**, and Defendants' Opposed Motion to Enforce Settlement Agreement [Doc. 105] is **DENIED** without prejudice to refiling, as follows:

(1) Within 30 days of entry of this Memorandum Opinion and Order, Defendants shall produce to Plaintiffs complete pay data (including names and contact information) for Defendants' current and former Care Coordinators, including all salaried employees who performed care coordination functions under various job titles, regardless of hire date and regardless of whether that employee signed the 2016 Arbitration Agreement, and excluding only those individuals who held the job title of Case Manager RN ("Complete Pay Data").

(2) If Plaintiffs elect to move for equitable relief from the Settlement Agreement, they must do so within 90 days of receipt of the Complete Pay Data. If Plaintiffs do not file a motion for equitable relief within 90 days of receipt of the Complete Pay Data, Defendants may file a motion to enforce the settlement agreement, seeking dismissal of this case.

(3) Reasonable attorney's fees and expenses will be awarded to Plaintiffs in connection with their efforts made between October 4, 2023 and February 28, 2024 to obtain a complete class list from Defendants, in an amount to be determined by the Court following submission of the required documentation by Plaintiffs and after consideration of any timely-filed objections by Defendants, as follows:  Plaintiffs shall file a motion for attorney's fees and expenses, including

24

supporting affidavits and documentation, within ten (10) days of entry of this Memorandum

Opinion and Order, and Defendants' objections, if any, to the reasonableness of Plaintiffs'

requests must be filed within fourteen (14) days thereafter.


      DATED this 15th day of April 2025.

MARTHA VÁZQUEZ
Senior United States District Judge